Good morning, Your Honors. I'm J. Patrick Fleming, Jr. I represent the appellants in this case, the Sundays Companies. I'd request reserving three minutes for rebuttal, if that pleases the Court. This appeal is about whether an agreement between the parties essentially eliminated any ability that my clients had to seek return of security deposits, all or some, after a termination in the future. The agreement that's in question nowhere waives the rights to return of the deposits. You won't find that anywhere. What you're going to find is creative interpretation of language within the agreement to suggest that it does. And I want to address the specific language of the agreement with you, because I think that's going to determine how you respond to this appeal. Because what we're dealing with here is a windfall to Irongate, where they're really not entitled to keep all or some of those deposit monies. Hawaii law basically requires that a waiver be intentional. It's got to be clear. It's got to be unequivocal. You can't play games with words and force somebody in this case to basically abandon $600,000 of deposit money. That's what we're talking about, and maybe 1.4. Can I ask this as a factual matter, because I don't have this clear in my head? Yes, sir. At the time that the settlement agreement was executed, were any of your clients in default at that point in time? That was a conclusion that the district court reached, and I think it was erroneous. There is nothing in the record to suggest that a notice of default had been issued, that a notice of termination had been issued, or even that a date certain for payment had been determined. Instead, what you're going to find in the complaint is the allegation by my clients that there was a period of time when nothing could be done. Irongate was not concluding deals with people for reasons that we need to determine, but that was the situation. So that is a potential amendment that might address the district court's concern. I mean, we did say to the court, we did request the opportunity, the court was asked, the district court, to allow amendment. He did not. But if those facts were before the district court, I would submit to this panel that he might have had a different perspective. Number one, you've got parties who have been on ice for a significant period of time. Now they come together, and what they're trying to do is reach a revised understanding. That's what this agreement is. Right, but that's why I was – for me, the context in which that agreement was reached matters in terms of how you would interpret it. And if your clients were basically at the point – I'm sorry, my voice is now failing me – were at the point of being in default, such that they were going to lose, you know, a good chunk of the deposits anyway, then it would make sense that they'd say, okay, if you will just give us a little bit more time, we're trying to line up financing, if you'll extend the closing date, if you'll give us that in exchange, we will basically waive the right that we otherwise would have had under the original sales contract. That, to me, makes sense, but then that's what I was trying to figure out. Is that what was going down? No. What you have here is not a default. What you do have is Iron Gate using its ability under the sales agreement to gain an additional benefit for my client. If you look at paragraph D-10 of the sales agreement, you're going to see that Iron Gate could have demanded a closing within 10 days. Now, a significant period of time had passed, and to require my client to come up with, I think it was $3 or $4 million within 10 days, was not feasible. So what she did was she negotiated. The parties negotiated a new understanding, and that was to give her essentially 45 days to come up with the cash to close the deal with an additional 30 days after that if she was willing to pay additional money. What was the quid pro quo? They wanted to not insist on the 10 days. The quid pro quo was the nonrefundable payments. She had to come up with an additional $600,000 or so within a very short time. And when I say she, I mean the principal behind the Sunday's companies. She had to come up with that money now if she wanted that additional time. Otherwise, Iron Gate was perfectly free to say 10 days, take it or leave it. We're going to fight over deposits later. Right. But that's, yeah, okay. I hear you. So it's not a default. I mean, they gave your client another aspect of consideration, which was the swap of the units, right? And as you'll see, if my client had been in default, I think they would have said something in the agreement about that. They didn't say that. Instead what they did was my client said, I'd like to reduce the amount of money that's involved here, go with a different unit. They said, fine. We're going to go ahead and enter into an understanding where the deposit money is going to be credited to that unit. So what's really important here, I think, is to recognize the distinction between the deposit money and the nonrefundable payments. Right. And what's lurking in the background in this whole picture is paragraph D37 of the sales agreement. That is what governs the deposit monies. And what it says is 15% you get to keep Iron Gate. Now, we will challenge that as a penalty, but nevertheless, they have this right to the 15%. My client had paid 20% for the original four properties. So what were they going to do with this additional payment that they were going to demand? It wasn't going to be called a deposit, because if it was called a deposit, then this provision would apply. Instead, they call it a nonrefundable payment. Clever use of words. It might actually have worked. The point is that they wound up, under that understanding, with 30%. But 10% of it, because if you look at the calculations, you'll see that that nonrefundable payment was equivalent to 10% of the sales prices for the four units. So, essentially, they called it something different. That's how they got around D37. And that is a big clue to how you should rule in this case. Because the concern about D37 tells you there's no way that they were going to eliminate the right of my client to a return of deposit money in excess of 15% had been eliminated. The district court, tell me if I'm wrong on this. The district court concluded that the, I think it's paragraph, is it paragraph 8 of the settlement agreement that really ends up being the one that matters the most? Yeah, the release. The district court concluded that that provision was unambiguous? I think it's, I think it's. Hang on. I was trying to remember. Is that what the court held? I don't remember the court saying that so much, Your Honors. I think the court felt that this was a situation that falled within a purchase and sale context. That because the remedy that we're seeking here is somehow related to a purchase and sale. Well, hang on. All I'm trying to get straight is that this case got resolved at the motion to dismiss stage, right? That's correct, Your Honor. And in order for the court to grant that kind of relief, the court had to say basically this is plain as day. The claim or claims that you've alleged are barred by this settlement agreement. And it's just, it's unambiguous. There's no ifs, ands, or buts. You are just out of court. That's what the judge concluded. Okay. So if we instead looked at this and said, you know, I don't know what this means. You've got a plausible reading. They've got a plausible reading. Who the hell knows what the party's actually intended here? What under Hawaii, I assume Hawaii law is what governs? Yes. What happens in that situation? Your Honor, that was addressed in our brief. And what we said was if you feel it's ambiguous, then it should go back down to the trial court, and it should be a matter for a jury to decide. That's how it gets dealt with in Hawaii law, where there's an ambiguity. The trial court doesn't make that determination. There's essentially a decision that's later made in front of the jury about how to resolve the ambiguity. So, but I would like to address that a little bit. Section 8, and this concept of the identical factual predicate, what Section 8 essentially waived or released were claims arising out of the litigation. And we've talked about the litigation in the briefs. What I think the district court did was it conflated relief with claims. Because in our case, we're seeking deposit money. We're doing it because there was a termination. And as a result of that termination, D-37 kicks in. There had been no termination up to the date of the agreement. That, I think, is undisputed. And so this provision, to the extent that it related back to the litigation, and the claims that could have been made in that litigation or were made in that litigation, is not effective as far as our case is concerned. There had been no termination. The termination happened after the settlement was entered into. And for that reason, D-37 kicks in. Does it arise out of a purchase and sale? I would suggest that it does not. And the reason is very obvious. You've got a termination, not a purchase and sale. Also, one other thing I'd point out to the court. When you look at that Section 8, Proviso A very clearly says, this release does not apply to claims arising after execution of this agreement. If you accept Irongate's position, that provision means nothing. It's a clear provision. It's very broad. If you enter into this agreement, fine. We're going to get rid of all the claims you could have made in the past. On a future basis, claims still may exist, may happen. And so what do you do with that provision? Well, in our case, what you say is, you have a termination that occurred after this agreement was entered into. You now have rights that you should be able to assert under D-37. And they even cited D-37 in their termination letter. So it's an active, real provision that can't be ignored. And unfortunately, the district court, one of the conclusions the court reached was that these claims existed at the time of the settlement agreement. They didn't. And for that reason alone, the complaint should have survived. And what should we, should be our bottom line, so far as you're concerned? Should we remain for further fact-finding, or should we rule as a fact? I mean, not as a fact, but as a matter of law. I would prefer, of course, that you rule as a matter of law, Your Honor, as far as the interpretation of the agreement is concerned. And what would be ruled as a matter of law, so far as you're concerned? That this claim is not barred by the release provisions of the settlement, not the settlement, of the agreement, and that it should be permitted to go forward. As the other Justice suggested, if you think there's ambiguity, then, of course, you could send it down for further proceedings consistent with that. But for sure, this dismissal should be reversed. And I would... Hang on. We're not in a position to rule definitively as to what this contract means, are we? All we have before us is an appeal from a motion to dismiss your case. If we reverse that, then the district court gets it back, and you guys will figure out what to do from there. We don't have any authority to do more than that, do we? I know you're reviewing this de novo, and so any comments you make about this agreement I think will be law of the case. So I invite you to do that if you care to. But if not, then, as you're suggesting, you could just send it back to the court indicating that this is a claim that... It's a plausible claim. It should not have been dismissed, and it should proceed. The reason I ask you the question, I think what you hope we do is resolve a factual dispute, and that's why I ask you so. If it was a question of law, you could then tell me why it is a question of law because I think we're looking at a factual dispute. If that's so, then it would obviously... No, you tell me whether I'm right or wrong when I say that to you. Your Honor, I think that the court has the ability, where it finds that an agreement is not ambiguous, to reach a determination about what that agreement means. And I think that because you're sitting here de novo, you have that ability. If you feel, though, that there's some ambiguity, then it's an issue of fact for a later determination by a jury, and I think that's what it boils down to. So with that, I thank the court for its attention. Okay. Yeah, well, you have a little bit of time for rebuttal. Thank you. Let's hear from your opponent. Good morning, Your Honors. May it please the Court, Andrew Lautenbach on behalf of Defendant Eppley, Iron Gate-Azurette BW, LLC. The task for the court today on this case is to enforce the settlement agreement that was entered into between the parties. I think that the settlement agreement is unambiguous. Judge Watson found... And it's paragraph 8, right? Well, there are two paragraphs in the settlement agreement that are relevant for... Four and eight, but eight is the one that has the... The release, right? Yeah. That's right. So let's just start. Why don't you respond first to the argument that your opponent just made about that Well, Your Honor, paragraph 8 releases all claims that were made or could have been made in the underlying litigation. And you had asked about context, and I'm going to go back and talk about context in a minute. But the section A, which is claims arising in the future, I believe the only reasonable interpretation of that would be potential claims for breach of the settlement agreement or claims that could not have been raised in the underlying litigation. So it could be a case where Iron Gate refuses to close, under the terms of the settlement agreement. Well, it says... Just read it. I'll read it to you. It says claims that release or may have arising A, this is the key provision, after the execution of this agreement, since there was no termination, I mean... Well, yeah, maybe you should give the context first. Right. Let's talk about the context. The context, first of all, there was a period of time where closings had been expected to happen, and they were delayed. That is true. But at some point in, I believe it was in 2010, the development started closing on units. And at that time, there was litigation filed by a number of purchasers seeking ways to get out of their contracts for purchase. And in response to some of that litigation, the developer, Iron Gate, filed its own litigation, which asserted numerous claims, including tort claims, but the relevant claims for purposes of today are a claim for specific performance, which was count one. This is at Excerpt of Record 156. Yeah, no, no, I'm making a face only because the term the litigation in paragraph eight is not defined. And so how do we know that it was intended to encompass the claims you asserted against the... Well, Your Honor, first in the settlement agreement, it discusses three different pieces of litigation. And then it goes on to use the term with capital letter L, the litigation. It didn't expressly define it. But Judge Watson asked that very question of Mr. Bernard Bays, who was representing the plaintiffs in the case below. And you can read the transcript on his response, but his response wasn't entirely clear to me. But he most certainly did not say that it did not involve the litigation that Iron Gate had filed. And I think the reasonable read of the settlement agreement is that it did, in fact, involve the litigation or include the litigation that Iron Gate had filed. Okay, let's assume you're right on that. Oh, excuse me. I didn't want to interrupt. The difficulty I have in the settlement agreement is in section four. And if you turn to the last part of section four of the settlement agreement, it says, should all the purchasers fail to close by June 27, 2011, or no more than 30 days thereafter, subject to the extension fee, all purchasers will forfeit to seller, that is, if this doesn't go through, all additional nonrefundable payments. Now, the word is additional. Now, up to that time, the buyer had made contributions and et cetera, now we're going to settle it. But the purchaser will forfeit to the seller all additional, will not, it says all purchasers will forfeit to the seller all additional nonrefundable payments made pursuant to this section four and furthermore release the rights of claims pursuant to section eight. What are the all additional nonrefundable payments? Well, Your Honor, pursuant to the terms of the settlement agreement, one of the items that the plaintiffs were required to do was to make additional nonrefundable payments that Mr. Fleming just said equated to 10% of the purchase price. Those payments were to be made immediately upon execution of the settlement agreement, I believe, and those were expressly nonrefundable pursuant to the terms of the settlement agreement and this paragraph four. Now, I think the use of the word additional suggests that the other payments prior to that point, which were the 20% deposits, were the other payments or deposits that now become nonrefundable upon a breach of the settlement agreement. Well, that's certainly not the only reading one could take of that phrase, right? I think it is the only reading when it's read in context of the remaining clause, which is and all claims are released pursuant to paragraph eight. Now, I wanted to get back to the context, which was Iron Gate had filed a claim, a complaint that sought not only specific performance, but also a breach of contract, including a claim for damages for breach of contract. Now, we looked at section D37 of the contract. That's the seller's remedies upon a default by the buyer. That provision allows for either specific performance or damages in the form of either liquidated damages up to 15% or actual damages if they exceed 15%. Which year they didn't, so we're just talking about that? Well, I wouldn't assume that they didn't, and we can talk about that if you'd like. I thought at least in— They've asserted that they didn't. I don't think the court necessarily needs to accept that as a fact. Did they allege that in the complaint? They've alleged that in the complaint. Well, then we have to take that as true for now. Okay, I hear you. Who knows how much those units got sold for, maybe? It's conclusory. They did sell for more than they were under contract for, but it was over the course of another year. And your reasonableness determination on a liquidated damages analysis, which doesn't apply under the settlement agreement, is at the time of the breach. And, of course, the market had bottomed. There were numerous purchasers trying to get out of their units here, and this developer is carrying a multi-hundred-million-dollar construction loan trying to keep this development afloat. The damage is that they suffer from purchasers not closing and then facing the task of selling into a down market when these units have been contracted for at the top of the market. There's a lot of issues with respect to that. I take issue with them saying that there was no damages. But that's beside the point. Getting back to the release of claims, under D37, prior to the settlement agreement, the developer had asserted a breach of contract cause of action. Against those other purchasers, not against these purchasers. Right, but the context here is that these purchasers are represented by the same counsel as certain of the purchasers that were in the litigation and were similarly situated. Now, Mr. Fleming just said it wasn't feasible for these purchasers to close within the 10 days that Iron Gate required. So for them to say that they weren't in default contradicts that statement. It also contradicts the fact that there was an allegation that purchasers were in default under their sales contracts in the litigation that Iron Gate had filed. I just don't understand when you say additional funds. I don't quite follow your determination that that doesn't benefit your adversary. They must mean something different from the original monies, right? That's correct, Your Honor. There were additional funds that were required to be paid. It was approximately $550,000 or $600,000. Only $50,000 of that was actually paid. But those were the, quote-unquote, additional non-refundable funds. But if you're reading this in context of those being additional non-refundable monies, the other monies that had been paid were the 20% deposits, the claim for which could have been asserted first in the litigation that sought to recover the entirety of the deposits on numerous different tort theories and other theories, but certainly in response to Iron Gate's assertion in its underlying litigation that it had a right to damages which would be beyond the liquidated damages that were at issue. Well, in my view, that isn't that clear from this language. What did the district judge state that language meant? The district judge focused, I believe, primarily on the fact that the waiver was as to all claims that Yeah, so you never got to this language here. I don't believe that he did. I'd go back and check if you're all— That's my understanding of the briefs, too. So if this additional language means something different from what you said, it would then mean that they win. I disagree, Your Honor. I know. I want to know why. They don't win because the forfeiture of the additional non-refundable monies, the $50,000 that was actually paid or the $500,000 or $600,000 that was supposed to be paid, that is another part of the consideration that the plaintiffs gave for this agreement. The second part of the consideration was the waiver of claims as reflected in paragraph 8, and that's all claims that were brought or that could have been brought relating or arising under the— arising out of the purchase and sale of these units. And now they've tried to say that there was no termination and there was no notice of termination at the time of the underlying litigation in 2011, but there had been a repudiation by the plaintiffs. There had been an assertion by Irongate that the plaintiffs, at least in the other litigation, who were similarly situated as these plaintiffs, had failed to perform and had repudiated. Irongate had a right to, in that litigation, assert its claims in the alternative, and it did. It asserted both specific performance and damages. The repudiation is equivalent to a termination. Well, this claim is—excuse me, do you want to get in, Jerry? For the last 20 minutes. No kidding. But I was passing because we're discussing what we're going to have to decide the case, and so that's all right, but I wonder if you've got a problem where you have defined what will be refunded and what will be defaulted, and what you now are holding is you're holding both. You're holding the whatever—I can't remember the exact number, but the number you were going to—if the contract didn't follow through, a certain sum would be taken. So you're holding that, and they are asking, all right, give us the difference, which they could have and should have asked in 2011. They had a right to ask that in 2011, and rather than Iron Gate asserting its right to prove its damages in 2011, Iron Gate agreed to this settlement agreement, and part of the consideration for that settlement agreement was give us additional money and give that to us now, and we'll give you more time to close. We'll give you an extra six weeks or whatever it was, and in addition to that, your claim for that part of the deposits that have already been paid, whatever amount you might have been able to get back, you're also releasing that claim. And where do we see that language? Where do we see that? That language is in, Your Honor, going back to Paragraph 8, and it refers to all claims that were asserted or could have been asserted. I'm sorry, I'll just read it. Claims made or asserted or that could have been made or asserted in the litigation, which would include a claim for a partial refund of those deposits, at least in response to Iron Gate's claim for damages in excess of the 15 percent. And it goes on to discuss all claims arising out of the purchase and sale of the units. Now, I wanted to address this definition of purchase and sale. The appellant would like to equate purchase and sale to a closing, and I don't think that that's accurate. I think purchase and sale is any matter that would arise related to arising out of the contract for the closing, the course of the closing, including the deposits that were made in the course of purchase and sale. To define it otherwise would basically exclude all of the claims that have been made in the underlying litigation for rescission because there have been no closings in that litigation either. So purchase and sale has to be the entire process, not just the closing. And, in fact, closing, the term closing is a defined term in the sales contracts. If they intended to only release claims arising out of the closing, which I don't even know what that would mean, they would have used that term closing. It's a defined term. Can I ask just a quick factual question? Those other purchasers who were involved in the litigation, had a closing date been set for them? Your Honor, I don't know if there had been a specific closing date. They had filed litigation. There was responsive litigation. I mean, everybody's cards were on the table in terms of what people's positions were. Yeah, okay. I'm fine. Oh, you're good. Okay. Can I ask you then the same question I posed to your opponent? Just if we were to conclude, let's say, that this provision, your reading of it is certainly a plausible one, but their reading is perhaps equally plausible in that scenario, I assume you would agree that what we would do is we would reverse the district court's dismissal of the action and we would just remand it basically without doing anything more? Well, Your Honor, if you were to find that this provision or settlement agreement in its entirety is ambiguous and therefore does not support Judge Watson's underlying ruling, then yes, it would be remanded for further proceedings in terms of resolving that ambiguity. As you can surely imagine, I would disagree with that ruling. I have to say, I mean, you haven't persuaded me that it's sort of cut and dry. I'm not saying your reading is wrong, but I certainly can't. I've heard everything you've said here, and I can't say that that's the only reading of this language. Well, Your Honor, I think that when you look at the fact that they're expressly agreeing that any additional payments are going to be nonrefundable, it would make no sense to say but prior payments might or might not be refundable. And this distinction between payments and deposits, I think, is a distinction without a difference. I mean, the language says deposit additional payments into escrow. It could have said pay additional deposits into escrow. Deposit additional deposits might have sounded awkward. I don't know. But I don't think that there's a reasonable reading where you can say I have $5. Give me one more dollar. That one dollar I can't get back, but I can go back and get two other dollars if there's some other two out of the original five. You could make that kind of agreement, though. You could make that kind of agreement. You could, but you would have to be express. I think in reading this contract, that's not what it says. I think it says just the opposite. Okay. Thank you, Counsel. Let's give your opponent a minute and three for rebuttal. Thank you, Your Honors. First of all, I think it's really true that if you're going to release something in Hawaii law, it's got to be, if you're going to waive your rights to something, it's got to be clear, unequivocal. It's not. D-37 remains out there as a legitimate part of the understanding between the parties, and all the evidence points to the fact that they chose to use this word payment instead of deposit because deposits still existed as a separate thing. If they had meant to say that the deposits were non-refundable, they could have said it very simply, and they didn't. And so there is nothing of that sort here. Now, Your Honor pointed, I'm sorry, Your Honor asked about, Judge Wallace, you asked about Paragraph 4, and I think what's important there is the last part of this, the last sentence. It says, The purchasers will forfeit to seller all additional non-refundable payments made pursuant to this Section 4. It says nothing about the deposits, and yet Counsel would have you read that to apply to all the deposits. What he then says is, oh, but, it goes on to say, and you furthermore release all rights and claims pursuant to Section 8. That's an odd dichotomy. I mean, number one, if you're going to say you're going to forfeit something, then say everything that's being forfeited and include the deposits. They don't say that. Instead, what they go on to say is, well, you are still going to be releasing your rights under Section 8. What that means is that under Section 8, you're waiving any rights you would have had or claims you would have had to pursue in the litigation. Those claims can't be renewed now. You've basically given that up so that we're going to enter into this agreement, and that ties into what did the litigation involve. At the time the litigation was filed, and indeed before the settlement, nobody could have sued to recover deposit monies based on a termination under D-37 because my client had not been terminated. And if you look at the litigation, what you're going to find is two cases were filed by investors. They were suing over misrepresentations that they claimed had been made to them. They were seeking a rescission, and as part of the relief for that rescission, they were seeking return of their deposits. That's different, a very different claim than seeking to get my deposit money, at least some and maybe all of it, back based on a termination. So it's not true to say that my clients could have been suing to recover before the settlement and indeed before the termination to get the deposit money under D-37. Counsel, your time is up. I'm sorry, Your Honor. Thank you very much. That's all I'd like to say. Thank you very much for your argument. The case just argued will stand submitted. We appreciate the helpful arguments. That concludes our calendar, but we are going to remain behind to answer some questions from students. I don't know if the teacher or the leader of this group here. Is that you? Oh.
judges: Wallace, Farris, Watford